**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**LAREDO DIVISION**

| | | |
|---|---|---|
| **BRABO INTERNATIONAL** | § | |
| **GROUP, INC.** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 5:19-CV-00066** |
| | § | **JURY** |
| **UNITED FIRE & CASUALTY** | § | |
| **COMPANY** | § | |
| *Defendant.* | § | |

**PLAINTIFF BRABO INTERNATIONAL GROUP INC.'S RESPONSE TO
DEFENDANT'S OPPOSED MOTION TO EXCLUDE OR LIMIT TESTIMONY OF
PLAINTIFF'S EXPERT WITNESSES**

Plaintiff BRABO INTERNATIONAL GROUP INC. ("Plaintiff" or "Brabo") files this response to Defendant UNITED FIRE & CASUALTY COMPANY's ("Defendant" or "UF") Opposed Motion to Exclude or Limit Testimony of Plainitff's Expert Witnesses (Dkt. No. 64) (the "Motion") as follows:

### SUMMARY OF THE ARGUMENT

This is a first-party commercial property insurance dispute. Defendant has taken a shotgun approach in the Motion of throwing everything against the wall to see what sticks, essentially asking for the entry of a directed verdict against Brabo. UF first asks the Court to strike or limit the opinions of *every* fact witness Plaintiff disclosed who may potentially offer testimony which the Court considers an "expert" opinion, including third-party witnesses who have performed repairs to the roofs that were identified out of an abundance of caution. Specifically, any argument that Plaintiff's disclosures as to Cord Largo and Stolk Labs in particular are so deficient so as to justify the exclusion of any potential expert testimony from these witnesses is laid to waste by various expert reports they produced to UF prior to litigation. UF then uses its own refusal to compensate both Doug Stolk and David Stolk as an excuse to now preclude them from testifying.

1

Finally, UF seeks to exclude Brabo's duly designated causation and damages retained experts, even though similar arguments related to Tom Irmiter have previously been rejected by this Court. Defendant's misplaced arguments are not the proper subject of a motion to exclude, and Defendant offers no legitimate legal basis under any relevant authority to exclude them. Tom Irmiter ("Irmiter") and Brian Johnson ("Johnson") are impeccably qualified experts who (1) have testified many times on these very issues (cause and extent of storm damages to buildings) in state and federal courts, (2) inspected the Properties at issue and prepared exhaustive, comprehensive, and data-driven reports reflecting their findings, and (3) can offer testimony that will undoubtedly aid the jury in assessing liability and damages at trial.

Brabo would incorporate its arguments and facts separately established in its response to UF's motion for summary judgment, as the Court finds necessary when considering the context of UF's arguments in this Motion.

### ARGUMENT AND AUTHORITIES

**A.   Under the relevant standards for admissibility of expert testimony under the Federal Rules, exclusion of experts is the exception rather than the rule.**

Under the Federal Rules of Civil Procedure, the following disclosures are required of a retained expert witness:

(i)     a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii)    the facts or data considered by the witness in forming them;

(iii)   any exhibits that will be used to summarize or support them;

(iv)    the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v)     a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition;

(vi)    and a statement of the compensation paid for the study and testimony in the case.

FED. R. CIV. P. 26(a)(2)(B). The rules for the disclosure of non-retained expert witnesses, on the other hand, are far more lenient, requiring only a statement of the subject matter and a summary of

the *expected* facts and opinions of which the expert will testify. According to the 2010 Advisory Committee Notes to Rule 26(a), this burden for disclosing non-retained experts is "considerably less extensive than the report required by Rule 26(a)(2)(B)" for retained expert witnesses. The comments further state that "[c]ourts must take care against requiring undue detail, keeping in mind that these witnesses have not been specially retained and *may not be as responsive to counsel*." *Tolan v. Cotton*, No. 09-1324, 2015 WL 5332171, at *5 (S.D. Tex. Sept. 14, 2015) (Harmon, J.) (citing the Advisory Committee's Note). In accordance with this Rule and the Court's Scheduling Order, Plaintiff designated both its retained experts and a variety of non-retained expert witnesses on February 21, 2020 (Dkt. 19).

The admissibility of expert testimony in federal courts is governed primarily by Federal Rules of Evidence 702, 703 and 704. Rule 702 provides that an expert must be qualified and the testimony be relevant and reliable. FED. R. EVID. 702. Significantly, as it relates to Defendant's concern that some of Brabo's experts relied on work product or expert reports prepared by others, Rule 703 provides as follows:

> **An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted**. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

FED. R. EVID. 703 (emphasis added). Finally, Rule 704 provides that "[a]n opinion is not objectionable because it embraces an ultimate issue." FED. R. EVID. 704. The court's inquiry into an expert is a flexible one, focusing on multiple factors. *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 594 (1993). Trial courts are afforded wide discretion when evaluating the admissibility of expert testimony. *Hamling v. United States*, 418 U.S. 87, 94 (1974).

If an expert is timely disclosed, the expert is admissible if it meets the standard set out in the Federal Rules of Evidence. Rule 702 recognizes five bases for qualifying an expert, and courts recognize that meeting one of the five criteria is sufficient: "knowledge, skill, experience, training, or education." FED. R. EVID. 702; *Lavespere v. Niagara Machine & Tool Works, Inc.*, 910 F.2d 167, 176 (5th Cir. 1990). The degree of qualification required "is only that necessary to insure that the witness's testimony 'assist' the trier of fact," which means the testimony helps the jury understand an issue. *Salinas v. State Farm Fire & Cas. Co.*, No. B-10-194, 2012 U.S. Dist. Lexis 153962, at *9 (S.D. Tex. Feb. 23, 2012). "If a witness has general expertise in a broad subject but is not a specialist in the specific aspect of that subject that is pertinent in the case, most courts have concluded that general knowledge of a subject can be sufficient in such a case to qualify the witness as an expert in a specialized field." *Id.* at *10 (*citing Huval v. Offshore Pipelines, Inc.*, 86 F.3d 454, 457–458 (5th Cir. 1996)).

Additionally, "[t]he test of reliability is necessarily a flexible one." *Eagle Oil & Gas Co. Travelers Prop. Cas. Co. of Am.*, No. 7:12-cv-00133-O, 2014 U.S. Dist. LEXIS 103537, at *9–10 (N.D. Tex. July 30, 2014). The non-exclusive list of factors for a court to consider under *Daubert* include the following: whether it (1) can be and has been tested; (2) has been subjected to peer review and publication; (3) has a high known or potential rate of error and standards controlling its operation; and (4) is generally accepted within the relevant scientific or technical community. *Vargas v. Lee*, 317 F.3d 498, 500 (5th Cir. 2003) (citing *Daubert*, 509 U.S. at 593–94). However, when an expert's opinions are based in large part on their experience in the field, the *Daubert* factors "are not pertinent" to determining reliability; rather, a court may find that the expert's experience and education form a reliable basis for their opinions. *Salinas*, 2012 U.S. Dist. Lexis 153962, at *18.

Given the broad spectrum of expert testimony that will assist the trier of fact in

understanding the case, courts recognize that "the rejection of expert testimony is the exception rather than the rule." *Eagle Oil & Gas Co.*, 2014 U.S. Dist. LEXIS at *10 (citing FED. R. EVID. 702, adv. comm. notes (2000)). Rather than simply excluding expert testimony, the "traditional and appropriate means" of attacking a party's evidence include "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Id.* (*citing Daubert*, 509 U.S. at 596)). Here, Defendant fails to carry its burden in proving that Brabo's disclosures in its original expert designation and subsequent amended disclosures under Rule 26(a) (Dkt. 64-13) were so inadequate as to preclude all of Brabo's non-retained experts from testifying and that Brabo's building consultant and engineering experts should be struck from testifying. In fact, the record demonstrates otherwise.

### B. The Court should deny UF's Effort to Exclude or Limit Plaintiff's Non-Retained Expert Witnesses, unless voluntarily limited by Brabo herein.

- **Plaintiff's Representatives/IGA Construction/Armando Garcia/Oralla Rodriguez**

Defendant seeks to exclude these non-retained expert witnesses designated by Plaintiff, claiming that Plaintiff's disclosures are inadequate. (Dkt. 64 ¶¶ 16-20) Except for IGA Construction ("IGA"), Brabo concedes its disclosures are insufficient and Plaintiff will not call any of these fact witnesses at trial with the intent to offer "expert" testimony. Brabo's designation of these witnesses were merely out of an abundance of caution. However, Brabo's disclosure of IGA was sufficient to place UF on notice of the possibility that, if subpoenaed to trial, an IGA representative may offer an opinion on the adequacy of any pre- or post-Storm repairs IGA performed, including the sufficiency of any general maintenance IGA may have performed at the Properties over some time period. (Dkt. No. 19 at 11.). While testimony of this nature likely does not even qualify as "expert" opinion, Brabo would request the Court reserve ruling on eliminating any ability of IGA to provide "expert" testimony until any IGA witness is actually called to trial,

where the Court will have the appropriate context to carefully evaluate whether specific "expert" testimony may fall outside Brabo's disclosures.

- **Cord Largo, Underpaid Claim ("UPC")**

Defendant seeks to exclude this non-retained expert witness designated by Plaintiff, again claiming that Plaintiff's disclosures are inadequate. (Dkt. 64 ¶¶ 22-23). UF then claims Cord Largo ("Largo") is unqualified to offer opinions about whether hail or wind from the Storm caused damage to the Properties. *Id*. at ¶¶ 24-26. Grasping at straws, UF lastly seeks to prevent *any* witness from testifying about the "existence or substance" or even relying on the various weather data and leak reports produced by UPC in its role as Plaintiff's licensed Texas public adjuster. *Id*. at ¶¶27-31.

As adequately referenced within Brabo's disclosures for UPC, Brabo provided UF with detailed Leak Reports, estimates and weather data as part of UPC's effort to adjust this claim for the Defendant[1]—it is undisputed that all these documents were attached to Plaintiff's 542A notice letter on **January 3, 2019**. (Dkt. 1 ¶ 27). In other words, the very work product from UPC that Defendant argues has not been adequately disclosed were provided to Defendant ***before*** this lawsuit was filed. Largo is a licensed Texas public adjuster who owns UPC—his only role was to assist Brabo in presenting its insurance claim and helping Brabo investigate its own loss, since UF wholly failed to do so. Brabo's disclosure of UPC also references "the allegations contained in Plaintiff's live Complaint," (Dkt. 64 ¶ 22) which contains additional information regarding Largo's involvement on the claim. (Dkt. 1 ¶¶ 13-15) Brabo's disclosures, Plaintiff's Complaint, and the underlying documents and reports provided to UF pre-suit all provide ample notice of what Largo

---

[1] Because Brabo had still not received a decision on the Claim by June 15, 2018, despite Brabo's repeated pleas for Peden to act, Brabo was forced to retain a licensed public adjuster at its own expense.

would be expected to opine on and the underlying facts Largo relied on to form those opinions.[2] As such, Brabo's disclosure of Largo more than complied with Rule 26(a)(2)(c).

Next, Defendant argues that Largo's opinion on the causation of damage to the properties, the dates on which the damage occurred, the extent of the damage, as well as the estimates reflecting the cost to repair said damages should be excluded because Largo is unqualified to opine on these matters. While the record demonstrates that Largo's education, experience and training qualify him to opine on all these issues, Plaintiff will refrain from offering Largo to provide expert opinions on (i) the *date* of the hail dimples which he marked across the roofs, (ii) the cost to repair the damages he identified, and (iii) that the roofs need to be replaced as a result of the Storm. However, Largo is certainly qualified to offer opinions on the size of hail that was reported during the Storm in the area (based on both his personal observations and weather data he sourced and reviewed), the wind speeds reported in the area (based on the weather data he sourced and reviewed), and that the leaks he observed to the interiors of the Properties were a result of the Storm. (Dkt. 64-4 at 32:16-25, 33:8-19, 67:20-68:12).[3]

Defendant also wishes to exclude the Leak Reports and Storm Data (Dkt. 64-5) that UPC produced to UF for Plaintiff's properties on the sole ground that this information was not personally prepared by Largo.[4] As an aside, UF's specific basis for challenging several of Largo's

---

[2] Largo was questioned at length during his deposition about all of these documents. Counsel for UF had no difficulty understanding exactly what Brabo meant when it disclosed Largo as providing, in part, "leak detection services to plaintiff." (Dkt. 64-4 at 47:10-48:10).

[3] Largo has worked as a licensed public adjuster for over seven years. (Dkt. 64-4 at 62:23-4). His position as a licensed adjuster permits him to adjust claims for insureds by identifying storm-related covered damage, and he has been trained on damage causation analysis. *Id.* at 63:5-64:5, 64:20-65:7. Prior to working as a public adjuster, Largo worked in construction, during which time he was tasked to complete inspections of storm-related damage and prepare damage estimates. *Id.* at 64:12-17. He has evaluated and assisted hundreds of commercial insureds in the adjustment of their first-party property insurance claims. *Id.* at 68:2-6.

[4] UF's argument that Irmiter and Johnson based their findings of new leaks solely on the Leak Reports is simply not true, as discussed *infra*. As any expert would do in this field, Irmiter and Johnson analyzed the leak reports and weather data procured by UPC, in conjunction with their own weather data from NOAA and tenant interviews.

opinions is unclear; especially here, where UF seeks to exclude the entire existence of these documents and any opinions stemming from them. Neither Brabo nor the Court should be forced to guess the basis for any of UF's generic challenges. If UF takes issue with his methodology, Defendant neither instructs the Court on any "standard" industry methodology nor do they suggest an appropriate standard methodology to the Court – they simply expect this Court to take their word on the subject that UPC prepared these reports incorrectly.

Largo hired an independent contractor named Ezekiel Otavera to inspect the properties in question, as well as to produce comprehensive Leak Reports for each property that correlated each new leak location with an area on the roof—some evidence of functional damage. (Dkt. 64-4 at 27:22-25, 28:13-16, 69:11-70:15, 76:3-77:3, 80:2-9).[5] Mr. Otavero was trained by a licensed Texas engineer to conduct these very types of inspections. *Id*. at 29:3-13. Mr. Otavero was acting under Largo's direction, was being paid by Largo, and Largo independently reviewed and signed off on the reports and data that Mr. Otavero was tasked to prepare. *Id*. at 66:2-6, 66:2-67:8, 71:1-6.

Indeed, Largo separately identified a variety of new or worsened leaks and took photos of them, having been on multiple inspections and conducting interviews of Blanca Moore and other tenants regarding the interior leaks and/or water streaks. *Id*. at 42:1-8, 48:3-10, 51:9-21, 52:3-11, 58:8-15, 59:7-15, 60:5-11, 61:1-14. That Largo did not personally prepare the Leak Reports or gather weather data is completely irrelevant. It is a black letter principle that an expert may rely upon work and or tests performed by someone else – even of a nature in which the expert does not have expertise. FED. R. EVID. 703. UF points this Court to no authority suggesting that a qualified expert cannot rely on a trained independent contractor (who is being compensated by the expert)

---

[5] Mr. Otavera went on a tour of the properties with Blanca Moore (Brabo's property manager of 14 years) on or about August 8, 2018 to establish a leak chronology by relying on Ms. Moore's personal historical observations and that of her tenants. They "took every effort to try and only identify newly observed leaks, which were the majority of them, and also any older/smaller leaks that may have significantly worsened by the Storm." (**Ex. 1** Declaration of Blanca Moore at ¶ 11).

to assist them with their work product—because this arrangement is extremely common among adjusters when reaching causation determinations on coverage issues *in the property insurance industry*.

As a Texas licensed public insurance adjuster, Largo is authorized to adjust all types of property claims, real and personal, just like any adjuster that works for an insurance company.[6]  It is common knowledge that the main job function of an insurance adjuster, whether retained by an aggrieved insured or regularly employed by an insurer, is to determine both the extent of a claimed loss and the cause of that loss.[7]  Those adjusters who are regularly employed by insurance companies opine on causation in every claim they adjust. When a loss-event occurs, it is the insurance adjuster who goes to the scene to investigate by examining the physical damage and interviewing any relevant witnesses.  After gathering all the relevant information, it is the adjuster who makes recommendations to the insurance company as to whether the loss was caused by something that was covered under the policy (which recommendation is usually accepted by the in-house adjuster).

Though not authoritative on evidentiary issues, Texas law is still persuasive.  In *Patel v. Nautilus Ins. Co*., the court found that the testimony of a claims adjuster who made a causation determination regarding damage to the insured's property was admissible as expert testimony.[8]  Because the adjuster's testimony was based on his training and experience, and the adjuster supported his opinion with ample objective data by referring repeatedly to photographic evidence

---

[6] *See* TEX. INS. CODE § 4102.101 (describing the general authority vested in adjusters by the State of Texas).

[7] "Successful claims representatives . . . determine liability to assess how the insurance coverage will respond [and] . . . must also gather and evaluate facts about the damages to determine the value of the claim."  James J. Markham *et al*., The Claims Environment (1st ed. 1993); *see also Palm Bay Yacht Club Condo. Ass'n, Inc. v. QBE Ins. Corp.*, 2012 WL 1345317, *6–9 (S.D. Fla. Apr. 18, 2012) ("Determining whether the damaged property should be repaired or replaced is subsumed in the process of adjusting a claim . . . Part of adjusting a claim is determining the cause of the damage.").

[8] *Patel v. Nautilus Ins. Co*., 2011 WL 345967, *6 (Tex. App.--Corpus Christi Jan. 28, 2011, pet. denied).

regarding the physical conditions of the building, the court refused to accept an argument that his opinion on causation was speculative, conclusory, and based on unfounded assumptions. As noted earlier, Largo took dozens of photographs of leaks throughout the interiors.

Largo's actions are also in line with the causation expert in *Broussard* who "considered and ruled out other causes for the initial damage to the Broussards' home by evaluating data . . . and eyewitness testimony.  He also based his conclusions on physical evidence left on the Broussards' property."  *Broussard v. State Farm Fire & Cas. Co*., 523 F.3d 618, 631 (5th Cir. 2008). Largo interviewed the property manager and a variety of tenants when taking his photos and identifying new interior damage. (Dkt. 64-4 at 42:1-8, 48:3-10, 51:9-21, 52:3-11, 58:8-15, 59:7-15, 60:5-11, 61:1-14). While UF's challenge to the reliability of the Leak Reports should be summarily rejected based on the arguments raised above, the testimony from one of the tenants at the Auburn location truly lays UF's position to waste. Ms. Romo recalled walking through the Auburn property where she identified a variety of new leaks. When shown photos from the Leak Report, she testified that virtually all of them represented new damage since May 21, 2017. (*See* **Ex. 2**, Deposition of Belinda Romo at 84:2-85:8, 86:23-88:21, 89:6-16, 90:24-91:8, 93:14-95:9).

"[T]he heart of *Daubert* is relevance and reliability.  As long as some reasonable indication of qualifications is adduced, the court may admit the evidence without abdicating its gate-keeping function.  After that, qualifications become an issue for the trier of fact rather than for the court in its gatekeeping capacity." *Rushing v. Kansas City Southern Ry. Co.,* 185 F.3d 496, 507 (5th Cir. 1999).  The critical point of the reliability inquiry "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

In reality, the Motion challenges Largo's conclusions and the weight that should be given

thereto, not the reliability or methodology of the leak reports and weather data procured for UPC. The Motion takes no issue, nor could it, with Largo qualifications to discuss his role in the claim process or data procured at both Largo's expense and request. As such, Largo should be permitted to offer testimony on (i) a discussion of the Storm Data gathered for UPC and presented to Defendant, (ii) a discussion of the Leak Reports and to establish a foundation for what they identify in the interiors of the Properties as being a result of the Storm,[9] and (iii) a timetable of his involvement in the adjustment of this claim, including his dealings with Patrick Peden of UF.

While offering testimony on some of these subjects may not even qualify as "expert" opinions, if the Court is not inclined to outright reject Defendant's request to completely exclude UPC's work product, Brabo would again respectfully request the Court reserve ruling on eliminating the ability of Largo to offer "expert" testimony (and especially defer any ruling prohibiting Brabo's other experts from relying on UPC's work product) until Largo is actually called to trial, where the Court will have the appropriate context to carefully evaluate the relevance and the significant prejudice to Plaintiff of foreclosing certain testimony.

- **Marcos Neri, Integrated Roofing**

Plaintiff will agree to limit Neri's testimony to that of a fact witness only, which includes any roof repairs Integrated performed on the properties post-Storm, the removal of panels and personal delivery of those panels to Stolk Labs per their protocol, appropriate repair methods and maintenance on these types of metal roofs, his dealings with Patrick Peden and UF on this claim and others, and roofs he has replaced in the vicinity of the properties due to storm damage that

---

[9] The Motion does not take issue with the accuracy of the Leak Reports or the weather data harvested from reliable sources—indeed, Defendant's retained engineer used and referenced UPC's Leak Reports when conducting his investigation.

were bought by other insurers. (Dkt. 64-7 at 89:23-91:9, 94:23-95:25, 104:17-105:17). Brabo will not call Neri as an expert on whether wind or hail from the Storm damaged Brabo's roofs.

- **Doug Stolk, David Stolk, Stolk Labs**[10]

Again, with no citation to any authority, UF first seeks to exclude these non-retained expert witnesses and to prohibit any expert from relying on their reports claiming Plaintiff's disclosures are inadequate and, strangely, that "the scope of the Stolk reports exceeds that of an unretained expert in that the reports opine on causation and whether or not the roofs will fail to perform their intended function to keep out elements over an extended period of time." (Dkt. 64 ¶¶ 38, 44-46). Defendant does not challenge David Stolk's qualifications, credentials, or expertise to interpret the metallurgical data from the panels he received[11]—unsurprising, given Dr. Cox (UF's retained metallurgist on this claim as well as numerous others in the Laredo area) previously retained Stolk Labs ("Stolk") to assist on hail indent investigations. (Dkt. 64-12 at 181:16-182:1).

UF attempts to justify the death-penalty sanction of excluding the entirety of Stolk's conclusions in their two expert reports under the disingenuous claim that Brabo's disclosures are inadequate, even though Dr. Cox was expressly retained by Patrick Peden in 2017 to "counter" the precise opinions Defendant now seeks to exclude. ("Q. And so you knew what [Brabo's] position at least was on whether the hail damage on the roofing systems was [functional] or [ ] cosmetic, in [Stolk Labs's] view; right? A. Yes.. . . Q. [Y]ou know what Stolk's position [was] on whether or not the hail damage was functional on the roofs; right? A. I did see Stolk's report, yes.").[12]

---

[10] Plaintiff will likely not subpoena Doug Stolk to appear at trial given his age, desire to retire, and per David Stolk's testimony that David had far more involvement in the preparation of the expert reports and the metallurgical analysis.

[11] UF's only challenge to Doug Stolk is that he allegedly "lacks the qualifications to give opinion testimony concerning alleged hail damage to Galvalume coated roof panels." (Dkt. 64 ¶ 40). In keeping with UF's shotgun approach throughout the Motion complaining of expert opinions UF disagrees with, UF offers no support or authority for this bald proposition.

[12] The details of the egregious claims-handling in this case, including David Andis' involvement in the adjustment of this claim since November 2017, are more fully set forth in Brabo's response to UF's summary judgment as incorporated herein. As relevant to the Motion, for example, even if the Court was to find Brabo's disclosures

Defendant's argument that Brabo's disclosure of these *non-retained experts* are so woefully inadequate as to prohibit both Doug Stolk and David Stolk (whose deposition was taken) from testifying at trial rings particularly hollow, given UF's disclosures of its own *retained experts*. Significantly, UF's Expert Disclosures provide absolutely **no opinions at all** for either Defendant's **retained** engineer or metallurgist—they simply refer Brabo to each expert report:

> **Mr. Spiekerman's opinions and the basis for his opinions are set forth in his BSC Forensics reports of February 22, 2019 previously produced as UFCC 557 – UFCC 751 (and variously included in the claim file documents previously produced). Mr. Spiekerman's summary report is attached hereto as Exhibit "3" which includes attachments containing his References, CV, and rate sheet.**
>
> * * *
>
> **Dr. Cox analyzed and examined representative metal panels removed from the roofs of the properties at issue. Dr. Cox's opinions and the basis for his opinions are set forth in his report of November 30, 2018 previously produced as UFCC 707 – UFCC 751 (and variously contained in the produced claim file of United Fire), as well as his deposition testimony, if any related to his work in this matter. Dr. Cox may supplement his opinions/reports based on additional metallurgical analysis, fact witness discovery, expert witness discovery, and documents produced in this matter.**[13]

What's good for the goose is good for the gander. Should the Court determine Brabo's Rule 26 amended disclosures of Stolk are inadequate (that referenced Stolk's two expert reports, which contained photographs of all their samples and underlying data), the Court should necessarily preclude Spiekerman and Dr. Cox from testifying at trial under the same rationale.

---

themselves are somehow insufficient as to Stolk, any suggestion of "prejudice and surprise" is belied by Patrick Peden's own efforts over approx. 16-18 months *before litigation was filed* to obtain reports from Dr. Cox that disagreed with the Stolk reports.

[13] (Dkt. 21 at pp. 6-7) (emphasis in original). The distinction between Brabo's disclosures of its non-retained experts and UF's retained experts is significant for two other reasons. First, it cannot be disputed that Brabo disclosed at least *some* substantive opinions that Plaintiff expected its non-retained experts to provide and followed up with more details as discovery progressed. (Dkt. 19; Dkt. 64-13). UF disclosed no substance or opinions of any kind for either Dr. Cox or Spiekerman in its actual Expert Disclosures. Second, UF cannot plead ignorance as to opinions that would be offered by its retained experts. On the other hand, given Brabo's non-retained experts were not specifically retained by counsel and "may not be as responsive to counsel" necessarily affords a party more leniency under Rule 26.

Incredibly, UF then uses *its own refusal to compensate* both Doug Stolk (to appear for a day-long deposition) <u>and</u> David Stolk (to spend additional 4-8 hours of time to prepare Stolk's samples and data for production to UF following his deposition) as an excuse to now preclude (i) both from testifying and, more pointedly, (ii) any use of their expert reports by Brabo's retained experts. (Dkt. 64 ¶¶ 40-48). David Stolk appeared for his deposition with a good faith expectation that UF would eventually compensate him for his time. Following the deposition, when it became clear that Defendant would not pay him anything for his time (preferring to only pay its own legal fees and retained experts), David Stolk understandably rejected Defendant's request to spend another **6-8 hours** of uncompensated time to prepare and voluntarily produce Stolk's raw data and samples. (Dkt. 64-12 at 166:11-167:1) ("If they can get agreement to release that information, I can take six to eight hours of my time to create and produce that file for you.").[14] As such, UF's hypocritical effort to now bar both David Stolk and his work product from trial on this ground is especially galling. (Dkt. 64 ¶ 48). Enough is enough—the Court should not condone UF's gamesmanship and punish Brabo for a situation which is entirely a result of Defendant's own misdeeds.

Citing no authority (par for the course), UF makes the bold claim that the Rules "do not require tender of expert fees to a non-retained expert." (Dkt. 64 ¶ 41). First, this claim is belied by both the Committee Notes of Rule 26 and the typical course and conduct among legal practitioners.[15] Second, Rule 45 *specifically* prohibits a party from attempting to extract expert

---

[14] UF's refusal to compensate David Stolk following his deposition led to Doug Stolk's failure to appear at his deposition a few weeks later.

[15] The ADVISORY COMMITTEE NOTES to Rule 26 provide: "Subdivision (b)(4)(A) provides for discovery of an expert who is to testify at the trial. A party can require one who intends to use the expert to state the substance of the testimony that the expert is expected to give. The court may order further discovery, and it has ample power to regulate its timing and scope and to prevent abuse. Ordinarily, **the order for further discovery shall compensate the expert for his time**. . ." The undersigned counsel has been involved in two separate MDLs where Judge Joseph Goodwin ordered that the party that actually subpoenaed the non-retained fact witness for deposition—in those cases, implant and explant surgeons—would pay their reasonable hourly rates for their time.

testimony via subpoena from a non-party witness who has not been retained by a party in the litigation. FED. R. CIV. P. 45(d)(3)(B)(ii)). Otherwise, a party could seek to force an expert to provide testimony without compensating the expert for his opinion—*precisely* what Defendant has done.[16] "If a litigant seeks to obtain facts or opinions acquired by the expert in furtherance of his or her expertise, as distinct from knowledge possessed by that person as an ordinary actor in or viewer of events pertinent to the case, then the litigant must pay the expert a reasonable expert's fee." *In re Agent Orange Prods. Liability Litigation*, D.C.N.Y.1985, 105 F.R.D. 577, 582.

This is particularly so since Defendant demanded Stolk spend 6-8 hours (*after* the deposition UF refused to compensate him for) and produce their proprietary EDX analyses and all the raw data. To be clear, the Motion seeks to bar any use of Stolk's expert reports based on a *limited amount* of raw data which Stolk did not produce photographs of within the two expert reports. However, the Motion conveniently fails to disclose that both UF and Cox have had access to the *vast* majority of Stolk's underlying data tree (reflecting his SEM and EDS analysis) since **late 2017**. (Dkt. 64-12 at 28:23-29:10). UF provides absolutely no rationale as to why the vast majority of information Dr. Cox already received, including the dozens of photographs and data contained in the reports which he was cross-examined on throughout his deposition, is somehow insufficient for UF to attempt to counter Stolk's conclusions at trial.[17]

Cox's biggest criticism of the reports seems to be David Stolk's use of a high magnification during examination, which he believes (without citation to any authority) "were much beyond

---

[16] *See* 1991 Advisory Committee Note to former FRCP 45(c)(3)(B)(ii)); *see also, e.g., Chavez ex rel. Chavez v. Board of Educ. of Tularosa Municipal School*, D.C.N.M. 2007, 2007 WL 1306734 (noting that Rule 45(c)(3)(B)(ii) designed to protect experts from being required to provide expert advice or assistance without proper compensation); *Cook v. CTC Communications Corp.*, D.C. N.H.2007, 2007 WL 1362379 (setting compensation at expert's regular hourly billing rate for location, collation, and review of documents).

[17] Unsurprisingly, Cox never provided any of his samples to Plaintiff—the entirety of their data was photographically produced in his expert report, in the exact same manner as in Stolk's reports. (Dkt. 65-8 at pp. 163-196). And just last week, Defendant produced billing records from Cox for the first time, despite claiming to have produced his "complete file" months ago. UF is simply in no position to cry foul.

commercial visual inspection criteria." (Dkt. 65-8 at p. 157). Stated differently, Cox believes the magnification (reflected in Stolk's various photographs of the cross sections) shows too many surface anomalies.[18] Stolk obviously disagrees, but this Court need not decide who is correct—this is the very point of cross-examination at trial. It bears repeating that there were *dozens* of photos and data that Stolk was cross-examined on throughout his deposition regarding the magnification levels he used. Beyond that, Stolk also made clear that Cox could have made use of his data and photos reflected in his reports *without needing the actual raw samples*. (Dkt. 64-12 at 154:19-158:16) ("…you can take a look at those micrographs and take a digital caliper and measure it physically on the image and get a millimeter measurement, and then you can measure the thickness where you see losses occurring, you know, corrosion attack, get that measurement in millimeters, measure the micron marker on one of those micrographs that you just measure and just do a cross-multiplication and you would get that percentage…You have a copy of [the raw data] here imbedded in the report…").

While the Motion next takes issue with David for not personally removing these samples from the properties or knowing when they occurred (Dkt. 64 ¶48), it is entirely unclear how these somehow make his opinions on the samples wholly unreliable.[19] The Motion certainly does not cite any authority where an expert in his field (or any expert for that matter) has been struck or limited on this basis. To the contrary, as part of his standard methodology, Stolk routinely relies on professional roofers to remove hail-damaged panels with a work order. (Dkt. 64-12 at 11:15-12:4, 182:24-183:25, 184:8-17). The same is true with his reliance on clients who retain him to supply him with all the applicable hail storm data and storm dates for his consideration, <u>which</u>

---

[18] Interestingly, Spiekerman elected to select panels having hail indents with depths of less than .021 inch. (Dkt. 65-8 at p. 158).

[19] UF's argument highlights yet another double standard within the Motion, as its retained metallurgist (Dr. Cox) was never onsite and relied on a local roofing company to extract the panels for him.

includes insurance adjusters. *Id*. at 179:2-180:25. David Stolk identified a multitude of reasons why the hail indentations reflected in the reports would have been more likely from the May 21, 2017 hail storm compared to an earlier storm. *Id*. at 188:23-189:17, 190:16-191:10. Finally, he clearly explained why the indentations he analyzed were consistent with hail versus other causes, consistent with the information conveyed to him by Marcos Neri. *Id*. at 15:13-16:25.

Rather than refuse to answer questions on loss of useful life (Dkt. 64 ¶49), David Stolk initially deferred to the ASM Handbooks so he could consider the corrosion rate, but ultimately opined based on references to published scientific literature that the panels he analyzed sustained about a 50% loss in useful life due to the hail strikes. (Dkt. 64-12 at 195:14-197:9). And UF's bald, unsupported criticisms of Stolk on both when red rust and hail penetrations would typically occur stemming from these types of hail indentations (Dkt. 64 ¶50) are classic examples of cross-examination fodder. *Id*. at 40:25-42:2, 44:9-25, 198:7-199:18, 200:21-201:10, 201:20-202:13 (providing references to corrosion rates and agreeing with the definition of "corrosion," also found in the MCA Manual definition referenced within the expert reports of Irmiter/Johnson).[20] Regardless of whether his conclusion is correct or not, Stolk sufficiently articulated a basis for his opinions. UF's argument goes to the credibility of Stolk's testimony not to the reliability of his methodology. *See J.P. Columbus Warehousing v. United Fire & Cas. Co*, Civ. No. 5:18-cv-00100, Dkt. 68, p. 10 (S.D. Tex. Nov. 5, 2020).

Even though his qualifications and experience were unchallenged in the Motion, in an effort to leave no doubt for the Court that David Stolk's opinions far exceed the minimum requirements of an expert in this field (as set forth by courts in this Circuit), Plaintiff would offer that (i) Stolk's microscopic examination and laboratory testing of the panels was consistent with

---

[20] Stolk's endorsement of the definition of corrosion used by Irmiter/Johnson in the joint reports is only relevant to rebut Defendant's erroneous claim that FBS relied *exclusively* on Stolk to define corrosion. (Dkt. 64 ¶ 56)

industry methodology and published standards in the field, (ii) Stolk's methodology of testing and gathering data has been generally accepted by others in the field, and (iii) Stolk's opinions were based on both published studies in this unique field and his extensive experience having performed 60 to 70 of these same analyses specific to metal roofs for over 20 years.[21] (Dkt. 64-12 at 12:15-24, 186:8-187:5, 187:9-188:17, 192:1-193:14). He has also received formal training on the use of scanning electron microscopes. *Id*. at 13:3-7.

But perhaps the most fundamental opinion he will offer the jury at trial, which was unchallenged in the Motion—that the hail dents he microscopically analyzed will result in the failure of those particular roof panels to perform their intended function to keep rain out over an extended period of time. (Dkt. 64-12 at 193:15-195:13). An opinion which none of Brabo's other experts can offer at trial.[22] And while Brabo is mindful of the Court's decision in *Tri Investments* limiting Irmiter on an analogous issue (that the indentations will cause corrosion at some point in time),[23] it is noteworthy that Patrick Peden refused to define what "an extended period of time"

---

[21] As the Court will see from his transcript, the methodology of his testing was unquestionably sound and his scientific opinions were based on peer-reviewed studies, where available. That said, when an expert's opinions are based in large part on their experience in the field, the *Daubert* factors "are not pertinent" to determining reliability; rather, a court may find that the expert's experience and education form a reliable basis for their opinions. *Salinas v. State Farm Fire & Cas. Co.*, No. B-10-194, 2012 U.S. Dist. Lexis 153962, at *9 (S.D. Tex. Feb. 23, 2012).

[22] Because Brabo is confident the Court will reject UF's argument that Stolk's Rule 26 disclosures (which referenced the experts reports Defendant had pre-litigation) fail to provide adequate notice for a Rule 26(a)(2)(C) witness, it is unclear whether Rule 37 even applies. FED. R. CIV. P. 37 (noting experts not properly disclosed may be excluded "unless the failure was substantially justified or is harmless"). That said, Brabo would emphasize the importance of the evidence to be offered by David Stolk in pursuing Brabo's various claims at trial and the obvious prejudice to Brabo, should the Court determine Stolk should have spent 4-8 of unreimbursed time preparing his samples and voluntarily turning over work product UF did not pay for—an issue completely outside Brabo's control. Because his exclusion under Rule 37 is neither mandatory or automatic, this Court should exercise the great discretion afforded it under the Rule and decline to strike Stolk on those types of complaints. *Carr v. Montgomery Cty.*, No. H-13-2795, 2015 U.S. Dist. LEXIS 136560, at *9 (S.D. Tex. 2015) (Miller, J.); *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 563-64 (5th Cir. 2004).

[23] *Tri Investments v. United Fire & Cas. Co.*, Civ. No. 5:18-cv-00116, Dkt. 82, pp. 11-12 (S.D. Tex. Nov. 15, 2019) (rejecting most of UF's *Daubert* challenges to Irmiter when determining his "opinions and conclusions of this type contained in the reports are based on sufficient facts and data").

meant in his deposition—even though he was the only person who could decide both how and whether the Cosmetic Damage Exclusion applied.

The totality of his testimony reflects David Stolk's ample qualifications to render expert opinions on all the topics in this field, and as more fully set forth in his reports. They will all directly relate to rebutting Defendant's flawed reliance on the Cosmetic Damage Exclusion. And the Motion's request for a death-penalty sanction because UF refused to pay David Stolk to prepare and gather a limited amount of raw data—especially where UF's own expert could have used the available data in Stolk's reports to draw any criticisms regarding their conclusions—is far beyond any reasonable sanction considering all the circumstances. The Motion should be rejected.

**C. Johnson and Irmiter are qualified retained experts whose opinions are reliable and will assist the jury in evaluating causation and damages in this case.**

The record demonstrates that Irmiter and Johnson are duly qualified experts whose opinions are based on facts fully developed in this case and others before this Court as applied to applicable industry standards. As an initial matter, the Motion does not take issue with their knowledge, qualifications, skill, education or experience, nor could it. UF only challenges the reliability of their methodology.

**1. Irmiter's and Johnson's methodologies used in this case to date the hail and determine wind speeds were comprehensive, and consistent with industry standards.**

For this case, Plaintiff retained Johnson and Irmiter's company Forensic Building Science ("FBS") to conduct an in-depth and comprehensive inspection at the Plaintiff's Properties, and to serve as testifying experts. Irmiter and Johnson are impeccably credentialed experts in their respective fields with significant expert experience outside of the litigation context. FBS employs a collaborative process, whereby FBS investigates and pertinent background information regarding the building performance over time, facts of the loss, and post-loss condition, and whereby Johnson provides analysis based on applicable engineering standards and methodologies. (*See* **Ex. 3,**

Declaration of Tom Irmiter ("Irmiter Decl.") ¶ 12) (attachments omitted).

Consistent with industry methodology, FBS and Johnson conducted a three-part inspection. (*See* **Ex. 4**, Declaration of Brian Johnson ("Johnson Decl.") ¶¶5-7 (attachments omitted); Irmiter Decl. ¶¶ 8-10). The first part is a visual inspection at the site, observing the conditions on the site at the time primarily focused on the facades that includes the four sides of the buildings. *Id*. The goal of the visual inspection is to look for anything indicative of the buildings changing from their original construction. *Id*. The second part of the inspection is the document review which includes analyzing the maintenance and service history when available, various damage patterns indicative of pre- or post-storm events and building blueprints when available, and to interview tenants, property managers, and others who may have been there before and after the event occurred in an attempt to notate pre-storm conditions. *Id*. The third phase is a more detailed inspection which includes quantification of damages (*e.g.*, number of hail hits within a quantifiable area of a roof assembly) and separating out pre-storm damage and other types of damage including defects in design, improper installation, or lack of maintenance. This condition assessment is essential in developing their damage causation theory and scope of repairs. In some instances, invasive inspections are performed. Ensuing damage to the interior elements is also documented. This damage is also segregated between damage that existed before the storm and new damage that has occurred as a result of the storm. *Id*.

After conducting this three-step process in this case, FBS and Johnson summarized their findings and completed Storm Damage Reports for both Properties. (Ex. 64-14 and 64-15; Irmiter Decl. ¶¶ 12-13; Johnson Decl. ¶ 8).

**2. Irmiter's and Johnson's methodologies support the bases for their opinions.**

From the Motion, it is clear Defendant either did not read the entire Storm Damage Reports or their deposition transcripts, or chose to selectively disregard important information in them. For

example, UF opens by making the bizarre and plainly inaccurate statement, citing outright misleading testimony from Irmiter when claiming that "Irmiter . . . testified that he has **no independent opinions concerning alleged hail damage outside of what is contained in the Stolk Labs reports** and that they are relying on Stolk regarding hail." (Dkt. 64 ¶54) (emphasis added). The actual testimony was as follows:

> Q. Okay. Are you going to be offering any opinions in this case **with respect to the metallurgy or the analysis conducted by the metallurgist**?
> A. **No. In this case I relied on the metallurgist**. We were not asked to do a metallurgy analysis. If you take a look on my screen behind me on the left, you'll see a piece of equipment. We actually do analyze metal. I look in this microscope a lot at metal fatigue issues. But no, on this case, I will not be offering that opinion. I'll be using the opinion that's been put forth by Stolk Labs.

So Irmiter/Johnson will exclusively rely on Stolk—**for any *metallurgical* opinions about how the hail caused microscopic functional damage** to the metal roofs. Irmiter's Reports and testimony are replete with his independent opinions on the hail damage, too numerous to cite within the record.

While the Motion again incorrectly claims FBS did not date the hail, Irmiter and Johnson's opinions as to the date and cause of loss, including their testimony, provide significant detail surrounding the wealth of publicly available information that showed the significant hail and wind storm that hit Laredo on May 21, 2017. (*See* Ex. 64-14 and 64-15 §§ 1.1-1.6.) Far from "conclusory," this is significantly supported information that led to their conclusion that the May 21, 2017 storm caused the damage to the Properties. (Irmiter Decl. ¶¶13-16; Johnson Decl. ¶¶ 8-11.) Clearly this Court agrees. *See Tri Investments v. United Fire & Cas. Co.*, Civ. No. 5:18-cv-00116, Dkt. 82, pp. 11-12 (S.D. Tex. Nov. 15, 2019) (determining Irmiter's "opinions and conclusions of this type contained in the reports are based on sufficient facts and data").

As briefed in Plaintiff's summary judgment response, Judge Saldana and Magistrate Kazen have both previously ruled that neither Plaintiff nor its experts are required to rule out every single

storm that happened near the Properties since they were constructed in 2001/2002. And yet, the Motion chastises them for failing to rule out any hail history *before 2007* (Dkt. 64 ¶ 57), even though Irmiter provided a sound rationale for doing so that was consistent with Stolk's opinion discussed *supra*—namely, that rust should appear in a hail dent within 8-10 years of the occurrence.[24] Regardless, Irmiter's and Hinojosa's opinions on the date of loss are based on a solid, data-driven foundation. This testimony will clearly help the jury both to demonstrate the extent of damages and – if United Fire meets its burden to show "some evidence" of the cosmetic hail damage exclusion – to rebut the exclusion. *See Standard Waste Sys. v. Mid-Continent Cas. Co.*, 612 F.3d 394, 398 (5th Cir. 2010); TEX. INS. CODE § 554.002.

Further, disregarding UF's impermissible reconfiguration of the applicable burdens of proof, Irmiter's and Johnson's opinions as to the roof damage are supported by the evidence and will assist the jury. Lest the Court is unclear as to the foundation for these opinions, these experts relied on a wide-ranging, comprehensive collection of industry texts, articles, and standards, in addition to reports and information provided by other experts, in arriving at their opinions. (*See* Ex. 64-14 and 64-15 §§ 1.8-1.9).

Defendant next complains that because they did not know the *exact* wind speed at the Properties during the Storm, they cannot opine that wind caused some of the damage to the roofs. (Dkt. 64 ¶ 60.) Neither Irmiter nor Johnson need to possess the expertise to testify on the *exact* wind speed that caused damage to the Properties (to the extent that was even possible to determine) on May 21, 2017. Based on their education, training, and experience, in addition to their onsite interviews conducted and other information and data they reviewed in formulating their opinions regarding the damage to the Properties, they are unquestionably qualified to testify in the field of

---

[24] (Dkt. 64-12 at 40:25-42:2, 44:9-25, 198:7-199:18, 200:21-201:10, 201:20-202:13).

meteorology on the issue of causation to the extent that their testimony focuses on identifying the May 21, 2017 storm as the event that more likely than not caused the type of wind damage they observed and identified on each roof in their reports. (Irmiter Decl. ¶13; Johnson Decl. ¶ 8.)[25] UF's generic reference to one piece of weather data showing wind speeds at the airport (Dkt. 64 ¶ 61) overlooks Irmiter's testimony and other weather data showing wind speeds that were at least 80mph half a mile from the properties, along with the other roof damage in the area and the objective onsite evidence on the roofs that demonstrated that the winds from the Storm exceeded the minimum design loads. (Dkt. 64-6 at 55:19-57:18, 70:12-71:9, 89:20-90:21, 222:11-223:16). But any debate over UF's interpretation of the wind speed data and Defendant's proffered theory on use of the Enhanced Fujita scale[26] is clearly not one resolved at the *Daubert* phase. Courts have recently rejected similar challenges to the reliability of other similar experts in property damage disputes, where the expert relied on his study of wind data. *See J.P. Columbus Warehousing v. United Fire & Cas. Co.*, Civ. No. 5:18-cv-00100, Dkt. 68, pp. 7-10 (S.D. Tex. Nov. 5, 2020) (finding expert provided a minimum basis for the reliability of his opinion that wind speeds of 95mph caused damage to metal roof panels during the May 2017 storm); *see also Caramba v. Nationwide Mut. Fire Ins*, 2020 WL 7684136, *3-4 (S.D. Tex. Dec. 24, 2020).

   Use of meteorological reports and NOAA data (some of which was produced by UPC, as

---

[25] "While no one knows the exact wind-speed experienced by each property during the Storm, winds were reported by numerous sources as high as 90 miles per hour in the area and there was also objective onsite evidence of wind-caused noticeable roof panel uplift, panel separation, permanent panel distortion, compression and bending of fasteners, and storm created openings at seams, consistent with 80+ mph winds. The objective onsite evidence also demonstrated that the winds from the Storm exceeded the minimum design loads, considering the type and age of both roofing systems. Moreover, we considered the Storm's effect on the individual components of the roofing systems and its effect on the overall structural systems. Because reliable independent weather data reflected high wind speeds and hail in the vicinity of the Properties, Johnson considered and evaluated other possible failure mechanisms to the structural components of the Properties other than the Storm. Damage from wind requires full replacement of the roofs' panels."

[26] https://www.weather.gov/oun/efscale ("The Enhanced Fujita Scale or EF Scale . . . is used to assign **a tornado a 'rating'** based on estimated wind speeds and related damage.") ((last visited on Feb. 15, 2021).

discussed earlier) that were relied upon by Irmiter/Johnson is common practice, and UF does not suggest either of these experts are unqualified to render conclusions based on their interpretation of such data. *See, e.g., Certain Underwriters at Lloyd's of London v. Lowen Valley View, L.L.C.*, Civ. Action No. 3:16-cv-0465-B, 2017 WL 3115142, at *3, *11 (N.D. Tex. July 7, 2017) (Boyle, J.) *aff'd*, 892 F.3d 167 (5th Cir. 2018). UF's various arguments regarding the data or sources of the data relied on by Irmiter/Johnson and the effect, if any, on their conclusions do not make their opinions or methodology unreliable. *U.S. v. 14.38 Acres of Land, More or Less Situated in Leflore Cty., Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (explaining that questions regarding the bases or sources of an expert opinion generally go toward the weight of the testimony, as opposed to its admissibility, and are properly left for the jury to consider) (citation omitted).

When arguing FBS couldn't determine whether the buildings were leaking (Dkt. 64 ¶65), Defendant selectively disregards their comprehensive analysis and review whereby both experts connect the presence of new leaks to both wind and hail storm damage based on the various onsite interviews, including their review of the depositions,[27] Leak Reports, weather data, and the other information listed in their reports which they reviewed. (*See* Ex. 64-14 and 64-15 §§ 1.1-1.5, 1.8, 7.1-7.5). This also disregards the comprehensive review and testing done by the experts at the site. *Id*. And UF's other complaints that FBS did not determine whether the roofs were leaking or the location of the leaks and *solely* relied on the Leak Reports they received from UPC to establish the leak chronology is plainly incorrect. (Dkt. 64-6 at 95:18-96:19, 223:17-24, 270:16-271:13; Irmiter Decl. ¶¶ 9-10, 13-14). But even if that were true, such reliance would be entirely common and acceptable for experts to rely on data developed by others if it is a kind ordinarily used by experts

---

[27] The depositions of Blanca Moore and the tenant representatives were not available at the time of Irmiter's and Johnson's depositions. However, both experts subsequently reviewed the tenant depositions, in addition to Blanca Moore's Declaration, which merely reinforced the conclusions they reached during their onsite interviews and based on the objective evidence of both wind and hail storm damage on the roofs. (Irmiter Decl. ¶ 14; Johnson Decl. ¶ 9.)

in that field.[28]

In sum, their analyses were not based solely on the Leak Reports or on the reports from Stolk. Their inspections and findings were comprehensive and specific. Their reports were based on (a) onsite interviews with tenants; (b) an inspection of each building's exterior, roof, interior, and damaged interior spaces; (c) weather reports from the National Oceanic and Atmospheric Administration and National Weather Service to cross-reference data on the May 21, 2017 hail storm's impact to the area; (d) data regarding the history of the properties; (e) a review of the American Society of Civil Engineers Guideline for Condition Assessment of Building Envelope and Minimum Design Loads for Buildings and Other Structures; (f) the methodology set forth in the ASTM Standards (Evaluating Water Leakage of Building Walls); (g) a variety of photographs taken by tenants and the Public Adjuster while previously onsite, along with those taken by them; and (h) historical records from Brabo reflecting historical and post-storm repairs and mitigation efforts in an effort to distinguish storm damage from any potential pre-storm repairs. There is no basis whatsoever to limit their opinions in this case.

## CONCLUSION AND PRAYER

UF's claim in the Motion that Brabo failed to provide adequate disclosures claim is clearly erroneous, and in many instances outright disingenuous. Moreover, disagreement over expert conclusions is not a proper basis for striking a party's properly designated and qualified expert. Stolk, Irmiter, and Johnson are qualified experts who will provide important testimony establishing and

---

[28] *See* FED. R. EVID. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993) ("Unlike an ordinary witness, . . . an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation.") (citation omitted); *Peteet v. Dow Chem. Co*., 868 F.2d 1428, 1432 (5th Cir. 1989) (rejecting argument that physician or toxicologist's opinion lacked an adequate basis for not personally examining the decedent because "[a] personal examination of the person or object of the expert's testimony is not required under Fed. R. Evid. 703") (citations omitted) and taking judicial notice that "the facts relied on by [the physician] [were] those usually considered by medical experts") (citation omitted).

quantifying Plaintiff's damages. There is no doubt that their testimony will assist the factfinder in understanding the evidence in this case. Furthermore, their testimony is a necessary component in proving up Plaintiff's damage and carrying their burden under Texas law. In accordance with *Daubert,* United Fire will have full opportunity to present contrary evidence and cross-examine them at trial. *See Daubert*, 509 U.S. at 596. The Court should deny United Fire's motion.

Respectfully submitted,

**LUNDQUIST LAW FIRM**

*/s/ William W. Lundquist*
William W. Lundquist
So. Dist. Texas No. 38019
Texas Bar No.: 24041369
743 W. 18th Street
Houston, TX 77008
Will@LundquistLawFirm.com
Telephone: (713) 425-5312
Facsimile: (713) 583-5586

ATTORNEY-IN-CHARGE FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on February 14, 2021, I electronically filed the foregoing document with the clerk of the court using the CM/ECF system, which will send notifications of such filing to the following counsel of record:

David P. Andis
David.andis@gkbklaw.com
25700 I-45 North, Ste. 130
Spring, Texas 77386
Telephone: (281) 367-6555
Facsimile: (281) 367-3705

*/s/ William W. Lundquist*
WILLIAM W. LUNDQUIST