IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

| | | |
|---|---|---|
| BRABO INTERNATIONAL GROUP, INC. | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 5:19-cv-00066 |
| | § | |
| UNITED FIRE & CASUALTY COMPANY | § | |
| *Defendant.* | § | |

**DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S OPPOSED MOTION TO EXCLUDE OR LIMIT TESTIMONY OF PLAINTIFF'S EXPERT WITNESSES**

TO THE HONORABLE JUDGE OF THIS COURT:

COMES NOW Defendant, United Fire & Casualty Company ("Defendant" or "United Fire"), in the above styled and numbered cause, and files this Reply to Plaintiff's Response to Defendant's Opposed Motion to Exclude or Limit Testimony of Plaintiff's Expert Witnesses and in support thereof would show the Court as follows:

**ARGUMENT AND AUTHORITIES IN REPLY**

**Plaintiff's Non-Retained Expert Witnesses**

**Blanca Liz Moore**

1. In its Response, Plaintiff does not brief or address United Fire's Motion with respect to Ms. Blanca Moore. Accordingly, such should be considered as non-opposition to the relief requested by United Fire regarding Ms. Moore. Accordingly, United Fire moves to strike any expert opinion from Ms. Moore and Plaintiff's Representatives for failure to properly disclose pursuant to FRCP 26(a)(2)(C).

**Plaintiff's Representatives**
**Armando Garcia**
**Oralia Rodriguez**

2.      Plaintiff concedes that its designations with respect to unnamed Plaintiff's representatives, Armando Garcia, and Oralia Rodriguez, are insufficient. Accordingly, United Fire moves to exclude any expert testimony from unnamed Plaintiff's representatives, Armando Garcia, and Oralia Rodriguez, due to Plaintiff's failure to properly disclose them as a non-retained expert.

**IGA Construction**

3.      Plaintiff contends that its designation of IGA Construction "was sufficient to place [United Fire] on notice of the possibility that, if subpoenaed to trial, an IFA representative may offer an opinion of the adequacy of any pre- or post-Storm repairs IGA performed, including the sufficiency of any general maintenance IGA may have performed at the Properties over some time period." (Dkt. #68 at p. 5). As noted in its Motion, IGA Construction, Armando Garcia, Marcos Neri, and Oralia Rodriguez were grouped together with no separate disclosure for IGA Construction. (Dkt. #19 at p.11).

4.      Further, nothing in Plaintiff's disclosure makes any mention of expert testimony regarding the adequacy of any repairs or sufficiency of any general maintenance by any person. Plaintiff stated the following, presumably, about IGA Construction and Armando Garcia,

> The persons or companies identified above worked on the properties to repair the damage stemming from the May 21, 2017 storm, supplied materials used to repair damage to the properties, and/or have knowledge of the claim in issue. Such persons have knowledge regarding the reasonable and necessary cost to repair the wind and hail damage to Plaintiff's properties and the repair methods necessary to properly repair the wind and/or hurricane damage to Plaintiff's property. Plaintiff's contractors may rely upon their respective receipts, invoices and other documents relating to their work performed on the property. Plaintiff would refer Defendant to the documents previously produced by Plaintiff, which provide the best-known contact information for the individuals and entities identified above.

(Dkt. #19 at p. 11).

2

5. Plaintiff's disclosure is insufficient to allow any expert opinion testimony by unnamed IGA Construction representative(s). As set forth in Defendant's Motion, a proper Rule 26(a)(2)(C) disclosure must state opinions, not merely topics of testimony, and must contain a summary of facts upon which the opinions are based. *Everett Financial, Inc. v. Primary Residential Mtg., Inc.*, No. 3:15-CV-1028-D, 2016 U.S. Dist. LEXIS 181517, 2017 WL 90366 at *2 (N.D. Tex. Dec. 19, 2016) (citations omitted). With respect to IGA Construction, Plaintiff's disclosure does not satisfy this requirement. Accordingly, United Fire respectfully requests that the Court not permit any testimony from any representative of IGA Construction on any issue requiring expert opinion, such as causation, adequacy of pre- or post-storm repairs, or cost of repairs not yet made to the Properties.

**Cord Largo, Under Paid Claim, LLC**

6. Plaintiff's designated Under Paid Claim, LLC, Cord Largo was follows:

> Under Paid Claim LLC and its representatives provided repair estimates and/or leak detection services to the Plaintiff, and may have knowledge of the Claim, the damage to the structure of Plaintiff's properties, communications with Patrick Peden related to the Claim, payments for repairs associated with the Claim, and the allegations contained in Plaintiff's live Complaint.

(Dkt. #19 at p. 9).

7. As with IGA Construction, Plaintiff's Rule 26(a)(2)(C) disclosure of Under Paid Claim, LLC / Cord Largo is insufficient as it fails to set forth any opinions of Cord Largo or a summary of the facts relied upon by Mr. Largo to form any opinions. Instead, the disclosure is nothing more than the identification of topics that Mr. Largo may testify on.

8. Nevertheless, despite the inadequacy of Plaintiff's disclosure, Plaintiff contends that Mr. Largo should be allowed to offer opinion testimony on (1) the size of the hail reported in

the area; (2) the wind speeds in the area, and (3) that the leaks he observed "to the interiors of the Properties were a result of the Storm". (Dkt. #68 at p. 7).

9.      Plaintiff fails to explain why it chose not to identify Mr. Largo as a retained testifying expert pursuant to FRCP 26(a)(2)(B). Further, Mr. Largo was specifically retained by Plaintiff – in exchange for a ten percent (10%) interest in any recovery from United Fire – in June 2018, prior to suit being filed. Given Plaintiff's financial relationship with Mr. Largo, it would appear that Plaintiff had no cost-based reason not to designate Mr. Largo as a retained expert.

10.      Nor does Plaintiff explain why Mr. Largo's opinions and the basis for those opinions were not disclosed in Plaintiff's designations, even as a non-retained expert. Nothing in Plaintiff's Response supports that Mr. Largo's opinions were unformed or unknown to Plaintiff at the time of its designations. Instead, Plaintiff seeks to shift to Defendant the burden of figuring out Mr. Largo's opinions in discovery without the benefit of a report prepared by Mr. Largo or a proper disclosure of Mr. Largo's opinions and the factual basis for those opinions.

11.      Concerning the "size of hail that was reported during the storm in the area" and "the wind speeds reported in the area", Plaintiff did not disclose those topics in its disclosure of Mr. Largo. Further Largo testified that he did not assist nor was he personally involved in obtaining the weather data for this storm. (Dkt. #64-4 at 31:14-16). Accordingly, Mr. Largo has no personal knowledge of the hail size or wind speeds at that property. With respect to hail size and wind speeds "in the area" such are irrelevant to any issue in this matter, such information is also unfairly prejudicial and confusing since the "area" is undefined, and hail sizes and wind speeds in other parts of Laredo (or even Mexico) on May 21, 2017 are not probative of what actually happened at the properties at issue.

4

12.     Concerning Plaintiff's contention that Mr. Largo should be permitted to testify that the "leaks he observed to the interiors of the Properties were a result of the Storm", Largo testified that he personally made no attempt to determine where or why there were leaks in the properties. (Dkt. #64-4 at 47:23-48:14). Concerning allegedly new or old leaks, Largo did not do anything to make any such determination other than documenting, by an uncaptioned photograph, what others may have told him. (*Id*. at 51:15-52:11; 59:11-60:3; 80:2-17). Accordingly, not only was Mr. Largo not properly designated, any testimony on these issues would not be based on personal knowledge and would be inadmissible hearsay.[1]

13.     The primary issues with respect to Mr. Largo are six "reports" under the Under Paid Claim banner. (Dkt. #64-5) On their face, these "reports" are undated, unsigned, not sealed, and are not attributed to any specific person or persons as the author(s). In his deposition, Largo stated that he did not prepare the "reports" and had no input into the reports, including the photographs. (Dkt. #64-4 at 27:16-17; 29:22-30:4; 30:8-21; 31:11-32:1; 41:18-25; 42:12-15; 42;21- 43:4; 45:1-6).  Nor did Largo attempt to correlate leaks to the source of the leak and the cause of the leak. (*Id*. at 48:6-14). Instead, these "reports" were prepared by an independent contractor named Zeke or Ezekial (but Mr. Largo did not know how to spell or pronounce the last name). (*Id*. at 28:1-14).

14.     However, Plaintiff appears to have had the ability to identify and, likely, access and contact Zeke – the reported author of these documents. Notwithstanding, Plaintiff not only failed to designate "Zeke" as an expert (whether retained or non-retained), but Plaintiff did not identify "Zeke" in any of its discovery responses, including responses to Initial Disclosures. Nevertheless, Plaintiff seeks to allow the use of these "reports" at trial either directly or indirectly through other

---

[1]  For an expert to be able to rely on inadmissible hearsay necessarily presuppose, the expert has been properly designated and disclosed.

of Plaintiff's designated experts. In other words, if Plaintiff wanted to use expert opinions of "Zeke", Plaintiff should have designated "Zeke" as a retained expert, and produced the documents required by FRCP 26(a)(2)(B), so that Defendant could have an opportunity to discover more about "Zeke's" opinions, including their admissibility, by deposition and disclosure. By withholding "Zeke's" identity, involvement, and not designating him, United Fire has been prejudiced in this matter as it concerns "Zeke's reports".

15.     Additionally, because the only person from Under Paid Claim that was designated and disclosed, Cord Largo, had no involvement whatsoever in the preparation of the six "reports", Plaintiff should not be permitted to tender the reports into evidence, nor should any expert be allowed to refer to or rely on these reports for any purpose, including Mr. Largo, Mr. Irmiter and Mr. Johnson – as none of these experts has any personal knowledge of alleged leaks outside of these "reports".[2]

16.     To the extent Mr. Largo has personal knowledge of facts, United Fire is not objecting to Mr. Largo testifying as to facts within his personal knowledge (presuming they are otherwise admissible); however, Mr. Largo should not be permitted to offer testimony in the form of expert opinions on storm data, causation, leak sources, leak reports, and other matters that require expert testimony, none of which Largo was properly designated on.

**Marcos Neri, Integrated Roofing Systems, Inc.**

17.     Plaintiff concedes that Marcos Neri should not be permitted to testify on matter requiring expert testimony. Accordingly, Mr. Neri's testimony should be limited to what he did,

---

[2] It is not clear how deposition testimony of Belinda Romo "lays to waste" United Fire's argument concerning these "reports". (Dkt. #68 at p. 10). Ms. Romo had never seen the "reports", is not mentioned in any of the "reports" as a person providing information, and she testified she doesn't know if she was even present to identify any alleged leaks in the "reports". (Dkt. #68-2 at 101:6-102:8). Accordingly, Ms. Romo cannot prove up or otherwise sponsor the "reports" into evidence.

personally, on the claim at issue. Opinions as to other persons and what he may have done with respect to other properties or claims in Laredo are not admissible or relevant to any issue in controversy between the parties.

**Doug Stolk, Stolk Labs, Inc.**

18.    Doug Stolk is a metallurgist and without his opinions. Plaintiff does not have a metallurgical expert.  As with Cord Largo, Plaintiff clearly had the opportunity to designate Doug Stolk as a retained expert and provide the required disclosures with its designation, yet Plaintiff chose not to do so. Nevertheless, Plaintiff seeks to admit the opinions of Doug Stolk – either directly in the form of two reports, or indirectly through other designated experts – and obtain evidentiary benefits of Doug Stolk's opinions without complying with FRCP 26(a)(2)(B).

19.    Plaintiff also attempts to shift its responsibility to properly designate to Defendant claiming that Defendant refused to pay Doug Stolk for his deposition time.[3] As set forth in its Motion, Doug Stolk's deposition was properly noticed (twice) and Doug Stolk did not appear at either deposition. The reason given for failure to appear at his second noticed deposition was a lack of payment for his time.

20.    Given Plaintiff's position that Doug Stolk and David Stolk were non-retained experts who did not need to be designated pursuant to FRCP 26(a)(2)(B), as it concerns depositions, FRCP 45(d) addresses situations, like a treating physician, and does not require the non-designating party to pay the non-retained expert for his/her deposition.[4]  *See Gaujacq v*

---

[3]  Plaintiff appears to argue, belatedly, that Defendant's expert designations are deficient. (Dkt. #68 at p. 13). If Plaintiff thought Defendant's disclosure were lacking, it could have filed a motion to strike or limit Defendant's experts. Plaintiff did not do so. Accordingly, Plaintiff has waived any issue regarding the sufficiency of Defendant's expert designations.

[4]  Neither Doug Stolk nor David Stolk sought protection from the deposition subpoenas served on them.

*Electricite De. Fr. Int'l N. Am.*, Cause No. 3-06-MC-042-D, 2006 U.S. Dist. LEXIS 33986 at *6 (N.D. Tex. 2006) (A treating physician is considered an ordinary fact witness and may be required to answer questions, based on personal knowledge of the examination, diagnosis, and treatment of a patient, that implicate the physician's expertise.) (citing *Young v. United States*, 181 F.R.D. 344, 346 (W.D. Tex. 1997)).

21.    Accordingly, as Doug Stolk signed and sealed reports concerning an alleged analysis he conducted on metal samples from the Plaintiff's roofs, and as he had not been designated as a retained expert, Defendant was not required to pay Doug Stolk for his deposition concerning his reports for Plaintiff's roofer, pre-suit, absent a an inquiry into unauthorized expert opinion. *Id*. at *7.

22.    With respect to the raw data of Doug Stolk and David Stolk, Plaintiff erroneously claims that Defendant (or its expert) have had access to "the vast majority of Stolk's underlying data tree" since late 2017. However, the deposition citation clearly states that David Stolk testified that "I have not presented to you" his raw data in his data tree for SEM and EDS analysis. (Dkt. #64-12 at 29:1-3). One of the requirements of a proper disclosure, includes the facts underlying the expert's opinions. Such was not disclosed or produced by Plaintiff with respect to the Stolks.

23.    Plaintiff, as the proponent of Doug Stolk's opinions, has the burden to show that Doug Stolk's testimony is relevant and reliable. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 590-91 (1993). It appears that Plaintiff is withdrawing its designation of Doug Stolk based on its statement in its Response that it will "likely not subpoena Doug Stolk to appear at trial". (Dkt. #68 at FN 10). However, to the extent that Plaintiff is equivocating with respect to Doug Stolk as an expert, there is nothing in Plaintiff's response that establishes Doug Stolk's qualifications with respect to hail and metal roofing panels. Accordingly, pursuant to FRE 702,

Doug Stolk should not be permitted to testify in this matter, and the opinions and conclusions in his reports should not be admitted nor relied upon by any person in any trial of this matter.

**David Stolk**

-     **Not designated as expert witness**

24.    David Stolk was not designated as an expert in this matter, either as retained or non-retained.[5] Presumably, Plaintiff intends to call David Stolk to testify as a non-retained expert pursuant to FRCP 26(a)(2)(C).[6] The purpose of the rule is "to ensure that an opposing party has some notice of what the non-retained expert will testify about." *Everett Financial, Inc. v. Primary Residential Mtg., Inc.*, No. 3:15-CV-1028-D, 2016 U.S. Dist. LEXIS 181517, 2017 WL 90366 at *2 (N.D. Tex. Dec. 19, 2016). A proper Rule 26(a)(2)(C) disclosure must state opinions, not merely topics of testimony, and must contain a summary of facts upon which the opinions are based. *Id.* (citations omitted).

25.    Importantly, Plaintiff makes no effort to explain its failure to disclose David Stolk as a testifying expert. Instead, Plaintiff, again, shifts the blame for its failure to Defendant claiming that Defendant was aware of the involvement of Stolk Labs in this matter. However, even were Defendant aware of the Stolk Lab reports, such does not necessarily mean that Plaintiff will be relying on those reports in litigation. It is not uncommon for a plaintiff in these first-party property

---

[5]  Most likely, Plaintiff does not intend to call David Stolk to testify at trial as long as Plaintiff is able to introduce or refer to the two reports of Stolk Labs.

[6]  The line between a non-retained expert and a retained expert appears to be a fine one. For example, "when a physician goes beyond what he personally saw and did and why as a treating physician . . . and opines about causation, prognosis or future disability not part of his treatment . . . the physician must provide an expert report." *Tolan v Cotton*, Civil Action N H-09-1324, 2015 U.S. Dist. LEXIS 121717, *4 (S.D.Tex. 2015) (Harmon, J.) (citations omitted). It is one thing for David Stolk to testify as to what he observed, but it is entirely different for him to testify as to what it means and how the insurance policy at issue is implicated. Plaintiff made the decision to not disclose David Stolk as an expert witness. Defendant should not be penalized for Plaintiff's failure to abide by FRCP 26 nor should Plaintiff be rewarded for failing to follow the rules.

claims to obtain reports from persons whom it has no intent on designating as expert witnesses at trial. For example, in the instant case, Plaintiff obtained cost estimates from Under Paid Claim prior to litigation. However, as Plaintiff stated in its Response, it does not intend to call Under Paid Claim to testify on the costs of repairs. (Dkt. #68 at p. 7). In the absence of a proper designation/disclosure, Defendant should not be forced to guess which persons may testify as experts and which will not just because a report was provided pre-suit by any particular person.

26.     As argued in its Motion, Plaintiff's identification of David Stolk in its amended disclosures is virtually identical to the expert designations identifying Doug Stolk. Nothing in Plaintiff's amended disclosures sets forth what David Stolk will testify to as distinguished from Doug Stolk. Further, as David Stolk is not a metallurgist, it appears that Plaintiff's amended disclosures provide no information as to David Stolk (i.e., David Stolk is not the "Mr. Stolk" referred to in the disclosures). (Dkt. #64-13 at p. 4).

27.     Additionally, although the Stolk Lab reports are signed by both David Stolk and Doug Stolk, the reports in themselves do not make any distinction as to who wrote what portions and whose opinions and conclusions are set forth in the reports. During his deposition, it appears that David Stolk conducted some of the underlying lab work and the results of that work appear to be his work product. However, because Doug Stolk is the licensed professional engineer on the reports, United Fire contends that the interpretation of the data, conclusions, and opinions contained in the reports should be attributed to Doug Stolk, and struck for the same reasons as set forth above as it concerns Doug Stolk.

28.     Further, as noted above, the Stolks, and David Stolk in particular, refused to produce the underlying raw data files from which the lab results were derived. Plaintiff still has not produced any support for either of the Stolks' opinions concerning the statements that the

hailstone impact regions "showed a significant loss of roof panel integrity" that "resulted in a direct loss of expected roof performance and lifespan and that hail "greatly diminished the expected lifespan of the roof" (Dkt. #64-8 at Brabo 000064, 000070, 000285, 000291)); that 4 years after the hail storm there would be red rust in hail indents (Dkt. #64-12 at 150:21-151:7); and that in 5-10 years, holes or penetrations would occur in the hail dents (*Id*. at 198:11-19). Moreover, during his deposition, David Stolk refused to answer questions concerning how much of the roof life (in time) has been lost due to hail. (Dkt. #64-12 at 52:6-54:24; 159:9-14). To the extent he subsequently answered related questions in response to Plaintiff's counsel, there is no support either in his deposition or in Plaintiff's Response for the reliability and admissibility of such opinions. Again, Plaintiff as the sponsor of the Stolks' opinions, has the burden to prove admissibility under Daubert, which Plaintiff has failed to do.

29.     Accordingly, the Court should not permit any testimony from David Stolk concerning how much life the roofs may have lost due to hail nor any opinions on the percentage of alleged life lost due to hail. Further, United Fire respectfully moves the Court to strike the Stolk Lab reports, including the portions containing lab results, and not permit such to be admitted into evidence for any reason in this matter, nor allow any person to reference or rely on such lab results or data. Further, United Fire requests that the Court not permit David Stolk to offer testimony or opinions in this matter.

**Motion to Exclude or Limit: Plaintiff's Retained Expert Witnesses**

**FBS Reports – Brian Craig Johnson and Tom Irmiter**

30.     United Fire has challenged the admissibility of certain conclusions / opinions of Irmiter and Johnson. Specifically, United Fire challenges the use of the Under Paid Claim "reports" and Stolk Reports by Irmiter and Johnson; their opinions that hail dents in Galvalume coated panels

display red rust within 8-10 years after the hail occurred (and their resulting decision to not look at hail history for the life of the roofs); and their opinions concerning alleged wind damage (metal crimping, uplift, permanent panel distortion, seam separation, and storm created openings, oil canning).

31.    In its Response, Plaintiff fails to provide the necessary proof that Irmiter's and Johnson's conclusions are admissible. Instead, Plaintiff focuses on methodology and restating the conclusions of Irmiter and Johnson – without establishing how Irmiter and Johnson's conclusions reliably result from their methodology.

32.    Citing *GE v. Joiner*,[7] Judge Rainy explained the interrelationship between methodology and conclusions. *Anderson v Bristol Myers Squibb Co.*, Civil Action No. H-95-0003, 1998 U.S. Dist. LEXIS 23259 (S.D.Tex. 1998).

> Conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*GE v. Joiner*, 522 U.S. at 146 (citation omitted).   That is, there must be a "fit" between the methodology and the conclusions drawn from the methodology.  *See Anderson v Bristol Myers Squibb Co.*, at *13-15 (citing various cases). In other words, an expert cannot simply start with reliable data and, from that data, draw any sort of conclusion. *Id*. at *15. Rather, the inferential process is itself subject to *Daubert* analysis. *Id*.  Otherwise, a court would be required to accept an expert's conclusion simply because the expert uses the "magic language". *Id*.

---

[7]  522 U.S. 136, 118 S. Ct. 512, 518-19, 139 L. Ed. 2d 508 (1997).

33.     Attached to Plaintiff's Response are the declarations of Thomas J. Irmiter (Dkt. #68-3) and Brian Craig Johnson (Dkt. #68-4) wherein they describe their methodology. As an initial matter, there are notable and significant issues with their stated methodology.

34.     Both state that, in this case, they inspected to "look for anything indicative of this building changing from its original construction" and that they inspect documents for "various damage patterns indicative of pre- or post-storm events and building blueprints when available."[8] (Dkt. #68-3 at par. 8-9 and Dkt. 68-4 at par. 5-6). However, Irmiter testified that he did not have access to or review the design plans for the buildings. (Dkt. #64-6 at 107:13-15, 233:16-18). Without the design plans, there would be no way to determine the specifications for the buildings, variations from codes or specifications, changes, and so forth. The buildings were built in 1999 (Auburn) and 2001 (JEF), yet neither Irmiter nor Johnson had any information or reference to the condition of the buildings prior to the May 2017 storm. They simply conclude that all the damage they noted was caused by the 2017 storm.

35.     Somewhat relatedly, they claim their methodology includes interviews with "tenants, building owners, and others who may have been there before and after the event occurred in an attempt to notate pre-storm conditions." (Dkt. #68-3 at par. 9 and Dkt. 68-4 at par. 6). Irmiter testified that he did not personally interview anyone during his one site visit in July 2019 and did not appear to have any personal knowledge that such interviews occurred. (Dkt. #64-6 at 27:25-28:4; 28:17-23).[9] Concerning the other FBS representatives who provided photos and other

---

[8] Irmiter's and Johnson's recitation of their 3 phase methodology reads more like boilerplate language rather than a specific recitation of what they actually did with respect to the properties at issue. What actual components of their inspections that occurred versus what they generally do to inspect would seem to be an important distinction in satisfying Plaintiff's burden to satisfy FRE 702 and *Daubert*.

[9] Johnson did not personally inspect the properties prior to signing and sealing the FBS reports. (Dkt. #64-16 at 36:13-15).

information, Irmiter testified that the occurrence of interviews would have been captured in the field notes. (Dkt. #64-6 at 28:17-23). However, Plaintiff has not produced the FBS field notes even though they have been requested and were agreed to be produced. (*Id*. at 24:15-25:1).

36.     Further, Irmiter and Johnson state that they "separate out prestorm damage and other types of damage including defects in design, improper installation, or lack of maintenance. This condition assessment is essential in developing a damage causation theory and scope of repairs." (Dkt. #68-3 at par. 10 and Dkt. 68-4 at par. 7). However, a close reading of their opinions and conclusions evidences that with respect to interior leaks, Irmiter and Johnson relied exclusively on the Under Paid Claim "reports" (and subsequently testimony of Blanca Moore). Regarding hail damage, Irmiter and Johnson rely on the Stolk Lab report.[10] That is, neither Irmiter nor Johnson did anything to confirm or substantiate the statements of others regarding leaks or the conclusions contained in the Stolk report. This relaying of the statements of others has previously caused Irmiter to by disqualified.

37.     Irmiter was designated as a testifying expert in the case of *Olivet Baptist Church v Church Mut. Ins. Co.,* 13 C 1625, 2016 U.S. Dist. LEXIS 25294 (N. D. Ill. 2016). In its written opinion, the trial court struck Irmiter as a testifying expert under FRE 702 for relying on the statements of others for his opinions. According to the court,

> On April 16, 2015, more than four years after the alleged windstorm, Irmiter inspected the property while accompanied by Henry Sawyer, another deacon at Olivet [the insured]… Irmiter observed "plaster cracks, efflorescence, and peeling paint, all of which was consistent with an older building." … He also surveyed historical records on Google Maps, Doc.

---

[10] Irmiter and Johnson cite to the MCA Roofing Installation Manual in their declarations claiming that publication states that "trapped water can cause premature corrosion to occur at the [hail] impact locations." (Dkt. #68-3 at par. 13 and Dkt. 68-4 at par. 8). Not only do they not cite specifically where in the MCA manual this is allegedly stated, but there is nothing in the MCA Roofing Installation Manual that refers to hail, hail impacts, hail indentations, or otherwise concerns hail. The referenced MCA manual concerns best practices for storing, handling, installing, and maintaining metal roof panels.

14

117-3 at 2, and the website Weather Underground, http://www.wunderground.com, which shows that local temperatures were above fifty degrees Fahrenheit in mid-February 2011, before falling below freezing for eight of nine days between February 20, 2011, and February 28, 2011. Doc. 118 at ¶¶ 24-25. Based on those weather patterns, the reporting of leakage on March 1, 2011, his inspection, and "information provided by representatives of the church," Irmiter concluded that March 1, 2011 was "the reasonable date of loss."

…

Although "an expert witness is not required to verify all the facts on which he relies," *Tilstra v. BouMatic LLC*, 791 F.3d 749, 753 (7th Cir. 2015), "[r]elaying the plaintiffs' likely testimony is not an example of expertise." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000). This limiting principle "is intended to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing." *Von der Ruhr v. Immtech Int'l, Inc.*, 570 F.3d 858, 864 (7th Cir. 2009) (internal quotation marks omitted). Put another way, Olivet cannot deploy Irmiter as a vehicle to introduce Sawyer's April 2015 lay observations regarding what caused the property damage. As the Seventh Circuit has explained: "The entirety of an expert's testimony cannot be the mere repetition of the out-of-court statements of others, and ... an expert witness may not simply summarize the out-of-court statements of others as his testimony. ... An expert who parrots an out-of-court statement is not giving expert testimony; he is a ventriloquist's dummy." *United States v. Brownlee*, 744 F.3d 479, 482 (7th Cir. 2014) (internal quotation marks and citations omitted).

*Id.* at *12-16.

38.     As in *Olivet*, Plaintiff is using Irmiter and Johnson to prove up interior leaks and non-cosmetic hail damage based on what others are saying, notably Blanca Moore, unnamed tenants, and Stolk Labs. As Irmiter's and Johnson's opinions on leaks and hail damage are based solely on others, they should not be permitted to opine on those subjects at any trial of this matter.

39.     Irmiter and Johnson are very experienced at testifying and using magic words to make it appear that their methods and conclusions are admissible.[11] However, notwithstanding the issues with their methodology, Irmiter's and Johnson's conclusions are not connected to their

---

[11]  Irmiter has been deposed over 500 times. (Dkt. #64-6 at 4:21-23).

stated methodology and are not supported by any reliable industry references. Instead, after reciting their methods, Irmiter and Johnson merely *conclude* that the May 2017 storm caused damage to the roofs such that they should be replaced. They fail to "connect the dots" between their data collection and their conclusions of storm damage. This is especially obvious concerning interior water leaks and non-cosmetic hail damage where all they do is restate what others told them.

40.     Concerning the date of any alleged hail indentions, Irmiter and Johnson are relying on their unproven theory that hail dents will exhibit red rust within 8-10 years. Their theory is that because they did not see any red rust the hail dents must be less than 8-10 years old, and because they claim there were no reported hail events 8-10 years before 2017 with the same size or larger hail reported, the hail dents they observed must be from 2017. For their theory to be admissible, Irmiter and Johnson must provide some basis for their opinion that hail will cause red rust on Galvalume coated panels within 8-10 years of its occurrence.

41.     In Webb County, Texas, since 2000, there have been 22 reported events with hail sizes of 1.5 inches and greater. (Dkt. #65-8 at p 150-151). There has been at least one hail event after the May 2017 storm but before Irmiter/FBS inspected the property. (*Id.* at p. 151). Contrary to Plaintiff's argument, Plaintiff has the burden to prove that the damage being claimed occurred on May 21, 2017 during the effective dates of the insurance policy at issue. *See Data Specialties, Inc. v. Transcontinental Ins. Co.*, 125 F.3d 909, 911 (5th Cir. 1997); *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 553 (5th Cir. 2004). Since Plaintiff has no other witness who can date when any alleged hail dents occurred, Plaintiff is relying on Irmiter and Johnson to prove this essential element of Plaintiff's lawsuit. Their opinions as to when the hail dents they believe they saw occurred is based on weather data and their opinion that hail dents will rust in 8-10 years, thus

16

as a starting point, based on that opinion, they rule out every hail storm in Laredo prior to 2007. With respect to hail storms between 2007 and 2012, Irmiter claims he looked at weather data and ruled those out. Yet there is nothing in his file that would support what he did, what weather he pulled, why other dates were ruled out based on the data, or any other work that would support his conclusory statements that he ruled out other dates from 2007 to 2017 as the cause of any hail dents.

42. With respect to older hail caused indentations, Irmiter did not review any weather data. Instead he ruled out every other date of hail older than 10 years based on his rusting theory. In its Response, instead of providing support for Irmiter's opinion that hail causes rusting in 8-10 years, Plaintiff references David Stolk's opinions that rusting will occur in 8-10 years. United Fire has challenged David Stolk's opinions on the occurrence of rust in a hail dent to a Galvalume coated metal panel but Plaintiff does not provide any basis for David Stolk's position. Further, even Irmiter testified his opinion was based on certain conditions that he did not attempt to test or confirm were applicable to the roofs at issue. (Dkt. #64-6 at 74:1-14).

43. As noted, it is Plaintiff's burden to establish that its expert's opinions are reliable and admissible. Plaintiff's conclusory arguments are insufficient to support the admissibility of Irmiter's and Johnson's conclusions as to when alleged hail dents occurred.

**FBS wind damage theories are not supported in science and are not reliable.**

44. Plaintiff seems to contend that because there is public data that showed a "significant hail and wind storm hit Laredo on May 21. 2017", that such is sufficient to support Irmiter's and Johnson's opinions that wind and hail damaged the subject properties. (Dkt. #68 at p. 21). However, this dispute is not about what may have happened in other parts of Laredo, Texas on May 21, 2017, but whether or not there is covered wind or hail damage to the properties at issue

17

as a result of the May 21, 2017 storm.

45.    United Fire has challenged the admissibility of Irmiter's and Johnson's opinions that winds from May 2017 damaged the metal roof panels causing "metal crimping, uplift, permanent panel distortion, seam separation, and storm created openings" and that winds damaged exterior components of the buildings such as the concrete walls.

46.    Regarding wind speeds, such information is important in order to distinguish between prior wind events and the alleged wind of May 2017. For Irmiter and Johnson to conclude that wind from May 2017, and only May 2017, caused the alleged wind damage, they need to be able to distinguish between the winds of May 2017 and prior wind events. However, without knowing wind speeds of May 2017, they are not in a position to distinguish prior events.

47.    Yet Irmiter and Johnson have put wind speeds at the properties in issue as they based their opinions of wind damage on "estimated" wind speeds *in the area*. As with hail size, reported wind speeds *in the area* are not probative with respect to wind speeds at the properties. That is, absent wind speeds being recorded by a measuring device (i.e. an anemometer), the only scientifically accepted method to estimate wind speeds at a location is the Enhanced Fujita Scale. The Enhanced Fujita Scale is used to estimate the wind speeds based on observed damage indicators (types of structures or vegetation). Although not conclusive, the Enhanced Fujita Scale is widely used and accepted. However, apparently, neither Irmiter nor Johnson used any accepted method of estimate wind speeds at the properties during the May 2017 storm as Plaintiff has not provided any evidence of how they reached their wind speed conclusions. Nor have they accounted for the lack of any collateral evidence that would exists if wind speeds were as high as they estimate (e.g. trees downed, air conditioner damage, overturned trailers). [12]

---

[12]  According to Belinda Romo, she either didn't remember any such damage or did not see any damage

48.     Likewise, Irmiter's and Johnson's conclusions that wind damaged the concrete walls and the roofs of the properties causing oil canning, shifting of panels, bending or shearing of screws, and separation of panels at end laps is not scientific and not based on any scientific principles. Instead of using reliable scientific grounds, and despite the lack of any evidence of high winds at the properties, FBS claims wind damage to the buildings due to the mere *ipse dixit* of Irmiter and Johnson. In other words, because there may have been high winds somewhere in Laredo on May 21, 2017, therefore, they conclude that there is wind damage at the subject properties.[13] Nor does Plaintiff explain the basis for Irmiter's and Johnson's opinions that cannot be confirmed visually (bent or sheared screws, seam shifting) or that can be confirmed (clips breaking or detaching) but were not. Likewise, Plaintiff fails to address United Fire's contention that Irmiter's and Johnson's oil canning opinions are not scientifically supported and are installation related as opposed to storm damage.

49.     Plaintiffs arguments are that Irmiter's and Johnson's methodology provide the foundation of their opinions regardless of how detached those opinions are from any methodology. In other words, the means justifies the end. Such is not proper under FRE 702. Conclusory arguments, magic words, and general methodology cannot make for admissible expert testimony. The opinions and conclusions of Irmiter and Johnson as set forth in United Fire's Motion are not reliable or admissible in this matter and should be struck by the Court.

---

to these items, nor did her company file an insurance claim as a result of the storm. (Dkt. #68-2 at 34:5-22). According to Julio Flores, tenant at JEF, there was no insurance claim resulting from the May 2017 storm, and no collateral damage to the area around the building including no damage to trees, fencing, overhead doors, or trailers. (Exhibit "K" to Defendant's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment at 28:13-29:6). Both Irmiter and Johnson state in their respective declarations that they reviewed these tenant transcripts. (Dkt. #68-3 at par 14 and Dkt. #68-4 at par 9).

[13]  Plaintiff does not address or rebut United Fire's contention that Irmiter and Johnson rely on certain camera tricks to photograph the "damage".

## CONCLUSION AND PRAYER

**WHEREFORE**, Defendant, United Fire & Casualty Company, respectfully requests that the Court grant its Opposed Motion to Exclude or Limit Testimony of Plaintiff's Expert Witnesses and grant any further relief to which Defendant may show itself justly entitled.

Respectfully submitted,

GAUNTT KOEN BINNEY & KIDD, LLP

By: _/s/ David P. Andis_____
     David P. Andis
     State Bar No. 00793265
     Southern District Federal ID: 19480
     Attorney in Charge
25700 I-45 North, Suite 130
Spring, Texas 77386
Telephone:    281-367-6555
Facsimile:    281-367-3705
Email: david.andis@gkbklaw.com
Counsel for Defendant

Of Counsel for Defendant:

    J. Chad Gauntt
    State Bar No. 07765990
    Southern District Federal ID: 14135
    Gauntt Koen Binney & Kidd, LLP
    25700 I-45 North, Suite 130
    Spring, Texas 77386
    Telephone:    281-367-6555
    Facsimile:    281-367-3705
    Email: chad.gauntt@gkbklaw.com

## <u>CERTIFICATE OF SERVICE</u>

This pleading was served in compliance with Rule 5 Federal Rules of Civil Procedure on February 22, 2021 via facsimile, first class regular mail, certified mail, return receipt requested and/or electronically.

William W. Lundquist (SBN: 24041369)
Lundquist Law Firm
743 W. 18th Street
Houston, TX  77008
Telephone:      832-255-3014
Facsimile:      713-583-5586
Email: will@lundquistlawfirm.com
Attorney for Plaintiff

_/s/ David P. Andis_____
David Andis